IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

NETTIE J. WALKER                          )
                                          )
              Plaintiff,                  )
                                          )
       v.                                 )       No. 2:03-0078
                                          )       Judge Nixon
MICHAEL J. ASTRUE,                        )       Magistrate Judge Griffin
Commissioner of Social Security,[1]       )
                                          )
              Defendant                   )


To:    The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

       The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of

the final decision of the Commissioner of the Social Security Administration denying the plaintiff's

application for Supplemental Security Income ("SSI"), as provided by the Social Security Act ("the

Act").

       According to both the ALJ and the defendant, the plaintiff filed an application for SSI on

August 31, 2000.[2]  (Tr. 91.)  The plaintiff alleged disability since November 19, 1998, due to a

_____

       [1]Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Michael J. Astrue is
automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of Social Security.

       [2]The record contains an Application for SSI dated September 15, 2000, and signed by the
plaintiff on September 25, 2000.  (Tr. 78-80.)  The Court is not able to find any record that the
plaintiff applied for benefits on August 31, 2000.  However, the exact date of her application is not
relevant to the disposition of this appeal.

1

spinal disorder and arthritis. (Tr. 78, 91.) The Commissioner denied the plaintiff's application initially and upon reconsideration. (Tr. 48-49, 50-51, 52-54, 63-66.) The plaintiff requested and received a hearing before the Administrative Law Judge ("ALJ"), where she was represented by counsel. (Tr. 71, 23-47.) By decision dated May 16, 2002, the ALJ found that the plaintiff was not disabled within the meaning of the Act. (Tr. 8-16.) The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied the plaintiff's request for review on October 25, 2002. (Tr. 4-5.) The plaintiff now requests judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## I. BACKGROUND

The plaintiff was born on June 25, 1959, was 39 years old on November 19, 1998, her alleged onset date. (Tr. 78.) The plaintiff completed the eighth grade. (Tr. 26.) The plaintiff has not had any type of formal vocational training. *Id.* The plaintiff was employed for five or six months in 1998 as a shoe cleaner (Tr. 27), but the ALJ found that this did not qualify as past relevant work, and concluded that the plaintiff had no past relevant work. (Tr. 14.)

The plaintiff first filed for disability on March 6, 1997.[3] (Tr. 12, 55.) The claim was denied initially, upon reconsideration, and by decision of an ALJ on November 18, 1998. (Tr. 12.) The Appeals Council denied the plaintiff's request for review on June 28, 2000, and no further action was taken. *Id.* The findings in the November 18, 1998, decision have become final and must be

---

[3]The November 18, 1998, decision states that the plaintiff filed her application for SSI on March 6, 1997, with a protective filing date of February 24, 1997. (Tr. 55.) The subsequent May 16, 2002, decision lists the previous application date as March 24, 1997. (Tr. 12.) This appears to be a typographical error combining the date of application and the protective filing date; therefore, the accurate date is likely March 6, 1997.

2

accepted as binding on the Social Security Administration in accordance with the doctrine of *res judicata,* which was specifically invoked by the ALJ in his May 16, 2002, decision. (Tr. 12.)

As a result, the plaintiff alleges an onset date of November 19, 1998 (Tr. 91), asserting disabling conditions of "degenerative arthritis, narrowing of the cervical spine [and] bulgeing [sic] disk and spurs." (Tr. 82.)

The plaintiff's primary care physician is Dr. J.D. Allred, although the plaintiff was referred to and treated by other physicians during the time period in question. The administrative record contains medical records from Dr. Allred dating from January 1994 through July 2000. (Tr. 111-33.) Dr. Allred noted that in 1994 the plaintiff suffered from arthritis and hypertension. (Tr. 133.) On several occasions, Dr. Allred documented the plaintiff's complaints of back, shoulder, and neck pain and continued to diagnose arthritis and recommend doses of ibuprofen for pain. (Tr. 123-24, 126-27, 130.) An MRI performed January 29, 1997, revealed a narrowed cervical canal with a moderate posterior disc bulge contributing to a moderately severe stenosis.[4] (Tr. 121, 144.) On June 19, 1997, Dr. Allred diagnosed stenosis of the cervical spine and noted symptoms of a ruptured cervical disc. (Tr. 122.) On January 31, 1998, Dr. Allred stated that a CT scan did not show a ruptured disc (Tr. 120), but on May 15, 1998, he did note a ruptured lumbar disc (Tr. 119).[5]

---

[4]Spinal stenosis results from spinal canal narrowing, causing pressure on the nerves or spinal cord. Pain is not relieved by standing still, but by flexing the back or by sitting. *The Merck Manual of Diagnosis and Therapy* 1362-63 (Robert Berkow, M.D., ed., 16th ed. 1992).

[5]Dr. Kimbrell, a radiologist, noted on May 18, 1998, that the plaintiff had a clinical history of ruptured lumbar disc, but that the CT scan of the lumbar spine was normal. (Tr. 139.) This is an apparent discrepancy with Dr. Allred's notes from three days earlier, cited above, in which he diagnosed a ruptured lumbar disc. (Tr. 119.)

3

The plaintiff's back and neck pain apparently worsened, necessitating an emergency room visit and follow-up with Dr. Allred on July 20, 1998. (Tr. 119.) The radiologist's report from July 20, 1998, states that there is "mild degenerative disk and degenerative spondylosis changes around the C5-6 level," and that "[c]hanges present have definitely increased since the previous x-ray of January of 1997." (Tr. 138, 199.) On September 24, 1998, Dr. Allred noted degenerative disc and degenerative spondylosis changes.[6] (Tr. 118, 137, 196.)

The plaintiff's back and neck pain continued to be well-documented through the rest of 1998 and into 1999. (Tr. 115-17.) A radiologist's report dated November 30, 1998, revealed no definite pathology of the cervical spine. (Tr. 136.) On February 17, 1999, Dr. Stallworth, a radiologist, reported "[m]inimal to very mild degenerative disk changes at L4-5 and L5-S1." (Tr. 170, 193.) An MRI on April 19, 1999, showed "very minimal degenerative disc disease." (Tr. 115.) On May 4, 1999, Dr. Smith, an orthopaedist, diagnosed the plaintiff with degenerative disc disease of C5-6, and recommended another MRI. (Tr. 235.) On May 12, 1999, an MRI of the plaintiff's cervical spine revealed "[f]airly marked spinal stenosis at C5-6 with osteophyte formation and some mild central extruded disc." (Tr. 190.) The radiologist also noted that the "CSF space anterior and posterior to the cord has been effaced" and that the "disc and osteophyte probably contact the cord and may compress it slightly." *Id.*

Dr. Allred continued to document the plaintiff's back and neck pain on visits through October 30, 1999, when he referred her to Summit Pain Management (the "pain clinic") in

_____

[6]Spondylosis is a degenerative condition of the cervical spine in which degenerative changes in both the intervertebral disc and the annulus and formation of bony osteophytes cause a narrowing of the cervical canal or neural foramina. This usually occurs between C-5 and C-6 or C-6 and C-7. *The Merck Manual* at 1516-17.

4

Nashville, Tennessee.  (Tr. 112, 240, 252.)  Following her referral to the pain clinic, Dr. Allred continued to see the plaintiff for routine ailments such as coughs and colds, but he no longer treated her for back pain.  (Tr. 28-29, 111-12.)

The plaintiff presented to the pain clinic on November 10, 1999, complaining of neck, shoulder, and arm pain, bilaterally.  (Tr. 252.)  The plaintiff described her pain as "constant, dull, deep aching pain in the neck with burning and tingling pain radiating down both arms."  The pain clinic also noted that the pain became worse with lifting or working with arms above head, and improved upon lying down and applying moist heat.  The plaintiff reported poor sleep, with trouble falling asleep, awakening with pain throughout the night, early morning awakening, and awakening feeling unrested.  She also reported headaches twice per week.  *Id.*  Upon physical exam, the plaintiff reported pain in her neck while performing a toe walk, and there was noted decreased range of motion at the waist and upper extremities due to pain.  (Tr. 253.)

In February 2000, the pain clinic diagnosed cervical radiculopathy,[7] ordered an MRI, and noted pain on a scale of 8/10.  (Tr. 247.)  The pain clinic completed another progress note on May 15, 2000.  (Tr. 242.)  The diagnoses in the May report included cervical degenerative disc disease, lumbar degenerative disc disease, cervical radiculopathy and lumbar radiculopathy. (Tr. 240, 243.)  The pain clinic gave the plaintiff a series of cervical epidural steroid injections, which provided only "minimal relief."  (Tr. 240, 242, 248-50.)  The plaintiff experienced bilateral shoulder pain and periodic numbness of bilateral arms.  (Tr. 240.)  She received treatments with the oral narcotics Lortab and Flexeril.  (Tr. 240, 242.)  The pain clinic recommended that the

---

[7]Radiculopathy is a term used to describe pain, tingling, numbness and weakness caused by degenerative changes affecting the spine.  Back.com, Symptoms of Radiculopathy, http://www.back.com/symptoms-radiculopathy.html (Last visited January 19, 2006).

5

plaintiff continue with these medications and see her primary care provider. (Tr. 243.) Dr. Long noted that the two-hour car trips to the pain clinic were difficult for the plaintiff and recommended that she continue treatment at a local office. (Tr. 240.) Dr. Long stated that the plaintiff's pain management was "well stabilized" and "well controlled" in June 2000 at the noted medication levels.[8] *Id.*

On August 8, 2000, the plaintiff was treated in the emergency room for severe neck and back pain. (Tr. 186.) The plaintiff was diagnosed with an acute neck sprain and lower back pain, treated and released for follow-up with a private physician. *Id.*

On November 3, 2000, state examiner Dr. Lawrence G. Schull filled out a Residual Physical Functional Capacity ("RFC") Assessment. (Tr. 255-62.) He assessed that the plaintiff could occasionally lift/carry a maximum of twenty pounds, frequently lift/carry a maximum of ten pounds, stand/walk for about six out of an eight hour workday, and sit about six hours in an eight hour workday, with no limitation on pushing and pulling. (Tr. 256.) Dr. Schull also indicated that the plaintiff was limited to occasionally stooping and climbing ladders. The physician's notes that presumably contain an explanation and citation of specific facts to support these conclusions are handwritten and illegible. *Id.* Dr. Denise Bell performed another RFC Assessment on January 11, 2001. (Tr. 264-70.) Dr. Bell's assessments were exactly the same as Dr. Schull's, except Dr. Bell did not place any limitations on climbing and stooping. *Id.*

On January 30, 2001, the plaintiff presented at the pain clinic with increased pain in her right elbow, shoulder, and posterior aspect of her ankle. (Tr. 273.) The plaintiff visited the pain

---

[8]Further corroboration for these statements can be found in a handwritten note from June 12, 2000, indicating that the plaintiff was "doing exceptionally well" but "continued to have difficulty with [the] drive [to the pain clinic]." (Tr. 241.)

clinic on March 7, 2001, complaining of neck, right leg, and right arm pain. (Tr. 272.) A discography report dated April 3, 2001, revealed mild degeneration in the C4-5 disc with concordant pain times two, and moderate degeneration of the C5-6 disc with concordant pain times ten. (Tr. 271.) Further findings from the discography included an annular tear with disc protrusion and presence of osteophytes contributing to central stenosis and mild right sided bony foraminal stenosis. (Tr. 275.) Dr. Long recommended fusion surgery at the C5-6 level to help with the plaintiff's pain complaints, which she rated as a ten out of ten. (Tr. 276.)

An administrative hearing was conducted on March 27, 2002, before ALJ Peter C. Edison. (Tr. 25.) The plaintiff testified about her treatment with Dr. Long at the pain clinic. (Tr. 27.) The plaintiff confirmed that she had received treatment at the pain clinic on a regular basis since 1999 in an attempt to manage her back, head, and neck pain. (Tr. 85.) The plaintiff underwent various procedures, treatments, and tests to better manage her pain, including injections, medications, and alternative treatments. (Tr. 28-29.) Dr. Long recommended surgery and referred the plaintiff to Dr. Schooley for a consultation for surgery to relieve her pain. (Tr. 30.) The plaintiff testified about her difficulties making the two hour trip to the pain clinic, including finding someone to drive her to her appointments and the necessity of stopping several times to get out of the car and straighten her back. (Tr. 31.)

The plaintiff testified that her pain was better when lying down and applying moist heat, which she did two or three times per day for fifteen to twenty minutes at a time. (Tr. 29.) On a typical day, the plaintiff stayed in bed until she was able to get up, and then sat on the couch and watched television or listened to the radio. (Tr. 30.) The plaintiff described her pain as constant, and was not comfortable sitting, standing, or lying down, but changed positions frequently

7

throughout the day to relieve the pain. She also reported trouble sleeping because of her pain. (Tr. 34.) She was not able to clean, cook, or do yard work. (Tr. 30-31.) She needed help with personal hygiene and grocery shopping. (Tr. 31.)

The plaintiff testified that she took Zoloft prescribed by Dr. Long for depression. (Tr. 33.) At the time of her hearing, she was additionally taking prescription medications including Lortab 10, Flexeril, Colace, and Lasix. (Tr. 32.) Side effects of these medications included stomach problems, nervousness, fluid retention, drowsiness, and constipation. (Tr. 33-34.)

The plaintiff described her pain as a "hard" pain in her shoulders, neck, hips, and legs. (Tr. 34-35.) The plaintiff testified that she is in pain all the time, and that the pain sometimes worsens. She says she has "a lot more bad days" than "medium days." (Tr. 35.) On the day of the hearing, the plaintiff testified that her pain was a 6 or 7 out of 10. (Tr. 36.) She testified that she could sit for about twenty minutes at a time, and stand about fifteen minutes at a time. (Tr. 36.) The plaintiff had difficulty walking, and testified that she could probably lift, but not hold, a gallon of milk. (Tr. 37.) She could not drive a car both because of her pain and because of the side effects of her medications. *Id.*

Kim Reeder, a Licenced Practical Nurse and the plaintiff's niece, testified that she spends one full day (six to eight hours) and two evenings (for three to four hours at a time) per week at the plaintiff's house, helping with tasks such as cleaning, cooking, washing clothes, personal hygiene, grocery shopping, and going to the pharmacy. (Tr. 38-39.) Ms. Reeder lived fifteen miles away from the plaintiff's house. (Tr. 41.) Ms. Reeder also testified that she drove the plaintiff to her doctors' appointments when possible, and that she had to stop and allow the plaintiff to get out several times on longer trips. (Tr. 40.) Ms. Reeder testified that while at the plaintiff's house, she

observed that the plaintiff had trouble sitting, standing, or lying down for extended periods. (Tr. 39.) Ms. Reeder stated that, "[the plaintiff] just can't get comfortable anyway, she can't get no [sic] amount of relief, laying, sitting, standing, you know, she has to be moving all the time, or laying to get some amount of ease." (Tr. 40.) Additionally, Ms. Reeder confirmed that the plaintiff's various medications caused the side effects the plaintiff had described. (Tr. 40-41.)

Elizabeth Campbell, a nurse's aid and acquaintance of the plaintiff, also assisted the plaintiff with her daily life. (Tr. 41-42.) Ms. Campbell testified that she went to the plaintiff's house two or three days a week and helped out by picking up the yard, going to the grocery store, or helping with other chores. (Tr. 42.) Ms. Campbell was not paid for her time, but helped the plaintiff out of friendship. *Id.* Ms. Campbell also corroborated the testimony of the plaintiff and Ms. Reeder that the plaintiff was unable to sit, stand, or lie down for any length of time, and had difficulty being comfortable because of her pain. (Tr. 43.)

The ALJ next questioned Dr. Kenneth Anchor, a Vocational Expert ("VE"). (Tr. 43-46.) The ALJ asked the VE to assume that the plaintiff retained an RFC to perform a full range of light work, and respond with the number of jobs that a person of the plaintiff's age and education could be expected to perform. (Tr. 44.) The VE testified that there were over 26,000 jobs, including table worker, storage attendant, small product packer, salad bar attendant, and supply attendant available in the Tennessee State labor market. With an added sit/stand option, all of the same jobs would be available with the exception of salad bar attendant, removing 3,500 jobs from the pool. *Id.* The VE testified that these jobs would all be low stress, fairly stable, routine and predictable. (Tr. 45.)

9

The VE also testified that if the ALJ found the plaintiff's and witnesses' testimony credible, the difficulties as described by the plaintiff would be at the severe level. If the plaintiff's difficulties were "chronic, persistent, unremitting, unresponsive to treatment and/or medication," the VE opined that "any type of full-time gainful activity . . . would not be feasible." *Id.* The VE also testified that if the plaintiff's rate of absenteeism exceeded two days per month, disciplinary action and eventual termination would result. (Tr. 45-46.) A frequent, ongoing pattern of absenteeism caused by medical reasons or doctors' appointments would rule out the identified jobs. (Tr. 46.)

Based on the record, the ALJ made the following findings in his May 16, 2002, decision. (Tr. 15.)

1. The claimant has not engaged in substantial gainful activity since filing the application for supplemental security income on August 31, 2000.

2. The claimant has degenerative disc disease and cervical arthritis, impairments considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5. The claimant has the residual functional capacity to lift and/or carry 10 pounds occasionally and 20 pounds frequently; sit 6 hours; stand and/or walk 2 hours; with a sit/stand option, and no high stress.

6. The claimant has no past relevant work (20 CFR § 416.965).

7. The claimant is a younger individual aged 18 to 44 (20 CFR § 416.963).

8. The claimant has a limited, eighth grade education (20 CFR § 416.964).

10

9. The claimant has no vocational skills that are transferable to other work (20 CFR § 404.1568).

10. There are a significant number of jobs in the national economy that the claimant could perform. Examples of such jobs are listed above.

11. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(f)).

## II. DISCUSSION

### A.   Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the

11

ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a-c), and 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Heston*, 245 F.3d at 534 (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. 20 C.F.R. § 416.920(a)(4)(I).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Heston*, 245 F.3d at 534 (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively

12

may constitute a severe impairment. 42 U.S.C.§ 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id*. (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id*. The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs*., 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a prima facie case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a prima facie case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can

13

perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled.[9] *Id. See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

In this case, the ALJ resolved the plaintiff's case at step five of the inquiry. The ALJ found, *inter alia*, that the plaintiff has the residual functional capacity to perform jobs that exist in significant numbers in the regional economy. (Tr. 709.)

---

[9]This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if he or she applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

14

The plaintiff appears to assert several grounds for reversal.[10]  First, the plaintiff asserts that the ALJ erred in not finding that her condition met Listing 1.04.  Second, the plaintiff argues that her subjective complaints should have been given more weight because they have been substantiated by objective medical testing and her credibility was bolstered by the testimony of two additional witnesses.  Third, the plaintiff asserts that the ALJ should have considered the absenteeism issue discussed by the plaintiff's counsel and the VE at the hearing, arguing that absenteeism necessitated by her medical treatments would prevent her from sustaining any full time work activity.  Finally, the plaintiff argues that the ALJ erred by not giving controlling weight to the opinions expressed by Dr. Allred in his medical assessment of October 7, 1998.  The plaintiff seeks a reversal and/or remand of the Commissioner's decision.

### B.      The ALJ erred in evaluating the plaintiff's subjective complaints

The ALJ employed the requisite five-step evaluation process detailed above in his decision. The ALJ found that the plaintiff was not engaged in substantial gainful activity.  (Tr. 15.)  He found that the plaintiff had degenerative disc disease and cervical arthritis, both "severe" impairments. (Tr. 12, 15.)  However, he found that these impairments did not meet or medically equal one of the listed impairments.  (Tr. 15.)  The plaintiff had no past relevant work.  The ALJ further found that the plaintiff's allegations regarding her limitations were not fully credible.  Given these findings, the ALJ basically adopted the position of the non-examining government medical consultants,

---

[10]  The plaintiff filed a motion for judgment on the record, unaccompanied by a memorandum in support.  The motion is a scant and disorganized three pages long.  The plaintiff did not include a statement of the case or a statement of the alleged errors.  However, the Court has attempted to fairly read the plaintiff's motion to allege the specific errors discussed herein.

Drs. Schull and Bell, and found that the plaintiff had an RFC to lift/carry twenty pounds occasionally and ten pounds frequently, sit up to six hours, stand/walk two hours with a sit/stand option, with no high stress.  *Id.*

As the basis for finding the plaintiff's testimony not fully credible, the ALJ stated that "[h]er testimony at the hearing was vague."  (Tr. 14.)  The ALJ also stated that the objective medical evidence used "terms such as 'mild'" to describe the plaintiff's spinal/cervical conditions, and the ALJ reasoned that "mild" conditions were not "sufficiently severe" to give rise to "the amount of pain alleged" by the plaintiff.  (Tr. 14, 36-41.)  There are several analytical problems with characterizing the plaintiff's impairments in this way, as discussed below.  Additionally, the VE testified that all of the plaintiff's difficulties, if accurately described by the plaintiff during the hearing, would be "at the severe level."  (Tr. 45.)  The VE further opined that if the plaintiff's problems persisted and did not respond to treatment, any type of full-time employment would be impossible.  *Id.*

Both the Social Security Administration ("SSA") and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain.  *See* 20 C.F.R. § 404.1529; *Felisky v. Bowen*, 35 F.3d 1027, 1037 (6th Cir. 1994).  While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[11]  The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition.

---

[11]Though *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987.  *See Felisky*, 35 F.3d at 1039 n. 2.

16

*Felisky*, 35 F.3d at 1039. The second prong is whether objective medical evidence confirms the severity of the alleged pain arising from the condition, or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

The regulations promulgated by the SSA additionally provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2). The SSA provides a list of factors to be considered in making these types of determinations. The Sixth Circuit in *Felisky* set forth these factors in detail, including: (a) daily activities, (b) location, duration, frequency and intensity of pain, (c) precipitating and aggravating factors, (d) type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (e) treatment, other than medication, received for relief of pain, and (f) any measures used to relieve pain. 35 F.3d at 1039-40.

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision as to credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reasons for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F.Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F.3d at 1036).

In this case, the ALJ did not properly apply the relevant standards for evaluating the plaintiff's complaints, and he failed to clearly state his reasons for rejecting her testimony. In rejecting the plaintiff's complaints of pain and limitations of function, the ALJ gave essentially two reasons: "vague" testimony from the plaintiff, and lack of support for her subjective complaints in the objective medical record. (Tr. 14.) The ALJ failed to provide, and the Court cannot find, any substantial evidence to support these conclusions. Therefore, the ALJ's analysis falls short under the applicable standards.

Examining the ALJ's analysis in light of *Duncan* and its progeny, it is clear that the ALJ concluded that the plaintiff satisfied the first prong: she has cervical arthritis and degenerative disc disease, which are "underlying medical conditions." (Tr. 14.) However, the ALJ's analysis is lacking under the second prong of *Duncan*, the relevant regulations, and the law of this Circuit. The ALJ stated that the plaintiff's testimony was "vague," but he neither provided an explanation nor gave examples to support this statement. The ALJ next stated that because the plaintiff's medical conditions were described as "mild," they could not produce the consistently high or severe levels of pain alleged. It is not necessarily true that only severe impairments produce severe pain. While the word "mild" may describe a particular physical condition (i.e., a "mild" fracture), the same word as used in a technical, medical sense does not necessarily translate directly to a corresponding quantifiable level of pain. It is significant that this case involves, *inter alia*, a condition that relates to compression of or interference with spinal nerves. It is reasonable to infer that even a relatively "mild" compression of one's cervical nerves could reasonably be expected to produce severe or disabling pain. The medical or technical use of a term to interpret a condition

18

seen on an x-ray or MRI should not be automatically assumed to apply as well to the level of pain that a condition can be expected to produce.

Additionally, although the ALJ found that the objective medical evidence does not support the plaintiff's complaints, his written opinion contains several references and citations to the objective medical record that clearly support the plaintiff's complaints. The ALJ noted incidents of muscle spasm in May 1999, decreased range of motion in November 1999, and pain management treatment with the prescription narcotics Lortab and Flexeril. (Tr. 14.) Lortab is a narcotic analgesic used for the relief of "moderate to moderately severe pain." *Physician's Desk Reference* 3240 (Thompson PDR, 59th ed., 2005). Lortab can cause side effects such as light-headedness, dizziness, and impairment of mental and physical performance, among others. It may be habit-forming, and a tolerance may develop with continued use. Incidence of side effects increases with dosage. *Id.* at 3240-41. Flexeril is a drug used "for relief of muscle spasm associated with acute, painful musculoskeletal conditions." *Id.* at 1931. Therefore, contrary to the ALJ's conclusion that the objective evidence fails to support the plaintiff's complaints of pain, *all* factors cited by the ALJ, including the presence of muscle spasm, documented decreases in range of motion, and her prescription drug treatment regimen, support the existence of a sufficiently severe condition capable of producing disabling pain.

### 1. The plaintiff's testimony about her daily activities

The evidence in the record strongly supports the conclusion that the plaintiff is able to perform only extremely limited daily activities. The ALJ noted that the plaintiff testified that she was able to sit for 15-20 minutes, stand 15 minutes, and lift about eight pounds. (Tr. 13.) Her daily

activities are usually restricted to moving from the bed to the couch, and occasionally sitting outside. (Tr. 30.) She has to lie down several times a day to relieve pain. (Tr. 34.) She is almost totally dependent upon her son, her niece, and a friend to do housework, yard work, run errands, and even sometimes to assist with her own basic personal hygiene. (Tr. 30-31.) The plaintiff is unable to drive a car, even to her own doctor's appointments, both because it is painful and because some of her medications cause dangerous side effects like drowsiness. (Tr. 31-32, 34.) The plaintiff's testimony regarding her daily activities was corroborated by the testimony of her niece and a friend, both of whom spend many hours a week assisting the plaintiff and both of whom are health care workers.[12] (Tr. 38-43.) The plaintiff's daily activities (or lack thereof) appear consistent with her claims of disabling pain.

### 2. The remaining *Felisky* factors support the plaintiff's complaints

The plaintiff testified about the location, frequency and duration of her pain. By all accounts, the plaintiff's pain was nearly constant, and had been documented by her treating physicians at a reported intensity level as high as ten out of ten. The existence and extent of her pain is substantiated by the objective medical evidence, as well as the testimony of two live witnesses at her hearing. Further, the evidence of record substantiates that the most mundane daily activities precipitate and aggravate the plaintiff's pain; simply sitting down for too long causes the plaintiff pain. The medications that the plaintiff takes to control her pain are powerful narcotics,

---

[12]Perceptible weight must be given to the testimony of lay witnesses where it is consistent with medical evidence. *See Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1054 (6th Cir. 1983).

Case 2:03-cv-00078   Document 17   Filed 09/24/08   Page 20 of 25 PageID #: 20

which in and of themselves can produce debilitating side effects.[13]  Surgery has been recommended as a treatment, and the plaintiff pursued a surgical referral, although it is not clear from the record whether any surgery had yet occurred.  There is also evidence of other measures used to relieve pain, such as lying down and applying moist heat, severely limiting daily activities to avoid aggravating her pain, injection treatments at the pain clinic, trips to the emergency room, and treatment with various over-the-counter pain medications such as acetaminophen.

### 3.     Under the relevant statutory law, regulations, and case law, the ALJ erred in evaluating the plaintiff's subjective complaints

In sum, the plaintiff did not engage in substantial daily activities and consistently complained of and sought treatment for her constant pain, which was only temporarily relieved by changing positions, and only somewhat responsive to narcotic painkillers.  Notably, none of the plaintiff's treating physicians expressed any doubts as to her veracity.  Other than referencing the plaintiff's "vague" testimony, the ALJ did not articulate any other basis for his decision to discount the plaintiff's credibility.  In reaching these determinations, the ALJ also failed to credit the testimony of the lay witnesses at the hearing.  For these reasons and in light of the authorities cited above, the Court finds that the ALJ erred in failing to consider and reconcile the additional regulatory factors with the objective medical evidence.  Consequently, his findings on the plaintiff's credibility and, by extension, her residual functional capacity, are not supported by substantial evidence.  Accordingly, the case should be remanded for further administrative proceedings with instructions to reevaluate the plaintiff's subjective complaints of pain and assign a new RFC.

---

[13]*See* discussion *supra* at 18-19.

C.      The Plaintiff's Remaining Assertions of Error

The plaintiff further argues that the ALJ erred in (1) failing to find that the plaintiff's condition met Listing 1.04, (2) neglecting to consider absenteeism, and (3) not giving controlling weight to the medical assessment of a treating physician. For the following reasons, the Court finds that the ALJ did not err with respect to the first two issues, but upon remand, the ALJ should revisit the October 7, 2008, medical assessment of Dr. Allred.

1.      The ALJ did not err in finding that the plaintiff's condition does not meet Listing 1.04 at step three of the sequential evaluation process.

At step three of the sequential evaluation process, the plaintiff has the burden of proving that her impairment is included in or equal in severity to those included in the Listing of Impairments. *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987). This demonstration must be based upon medical evidence alone, supported by acceptable clinical and diagnostic techniques, and must include a showing that all of the specified medical criteria are present. *See Sullivan v. Zebley,* 493 U.S. 521, 530-31, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990); *Hale v. Sec'y of Health & Human Servs.*, 816 F.2d 1078, 1083 (6th Cir. 1987); *Dorton v. Heckler,* 789 F.2d 363, 366 (6th Cir. 1986); 20 C.F.R. § 416.925.

The plaintiff argues that the results of the January 29, 1997, cervical MRI (Tr. 144) meet the criteria in Listing 1.04. (Pl.'s Br. 2.) This medical report was weighed and fully evaluated when the plaintiff's prior application was adjudicated and denied on November 18, 1998. (Tr. 58.) At the time of the previous decision, the ALJ found that the MRI results did not meet the severity required by Listing 1.04. The plaintiff took no further action on this claim, and the prior administrative findings remain controlling and binding under the principles of *res judicata*.

22

## 2. The ALJ did not err in failing to consider the VE's statements about absenteeism.

The plaintiff also argues that the ALJ should have considered the excessive rate of absenteeism that the plaintiff would have if she attempted to perform any jobs listed by the VE at the hearing. Though a treating physician's opinion regarding a plaintiff's expected rate of absenteeism may be entitled to deference, there was no such opinion from a treating physician in this case. *See Sharp v. Barnhart*, 152 Fed. Appx. 503, 510 (6th Cir. Oct. 26, 2005) (unpublished) (quoting *Abendroth v. Barnhart*, 26 Fed. Appx. 580 (7th Cir. Jan. 31, 2002) (such an opinion goes to the "nature and severity of a medical condition [that] is entitled to controlling weight if well-supported by medical findings and not inconsistent with other substantial evidence"). The VE simply made a general statement that if the rate of absenteeism exceeded two days per month, disciplinary actions or termination would result. The ALJ is not required to specifically address such an opinion, since it is not the opinion of a treating physician, and was merely a generalized answer given in the context of a hypothetical question posed at the hearing. The ALJ did not err in failing to assess this issue under these circumstances.

## 3. On remand, the ALJ should consider the medical assessment of the plaintiff's treating physician.

Finally, the plaintiff asserts that the ALJ erred in failing to give controlling weight to Dr. Allred's medical assessment dated October 7, 1998. (Tr. 179-181.) Although the ALJ is not bound by the opinions and assessments of treating physicians, he must nonetheless consider and weigh them, and give reasons for rejecting them. *See generally Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998) (discussing the Social Security Administration's "treating source rule"). Social

Security regulations and well-settled case law require the agency to "give good reasons" for disregarding the medical opinion of a treating physician. 20 C.F.R.§ 404.1527(d)(2); *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

Although the October 7, 1998, assessment was completed prior to the date of the previous decision on November 18, 1998, it is not clear whether this assessment was in the record or taken into account by the ALJ at the time of that decision. In the November 18, 1998, decision, the ALJ stated that medical records from Dr. Allred dating from February 1994 to May 18, 1998, were considered. (Tr. 57.) In his May 16, 2002, decision, the ALJ specifically noted that records from Dr. Allred dating from January 28, 1994, through July 10, 2000, were considered. (Tr. 12.) However, he did not specifically mention or include any evaluation of the October 7, 1998, assessment. The Court's copy of this assessment is poor and almost completely illegible. Therefore, this Court is unable to determine whether the assessment in question supports the plaintiff's claims and should have been taken into account. On remand, the ALJ is directed to evaluate all medical evidence of record, and give adequate reasons for accepting or rejecting the opinions of the plaintiff's treating physicians.

## **RECOMMENDATION**

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 13) be GRANTED to the extent that the Commissioner's decision be REMANDED for further proceedings consistent with this Report and Recommendation.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this notice, and must state with particularity the specific portions

of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge